**CALDWELL v. SOUTHERN PAC. CO.**
**No. 547.**

District Court, S. D. California,
Northern Division.

May 23, 1947.

Hildebrand, Bills & McLeod, James A. Myers and Clifton Hildebrand, all of Oakland, Cal., and Martin Thuesen, of Fresno, Cal., for plaintiff.

Johnson, Ricksen & Johnson, and Marshall Ricksen, all of Oakland, Cal., and Walter H. Stammer, of Fresno, Cal., for defendant.

YANKWICH, District Judge.

On September 6, 1946, the plaintiff, a switchman in the employ of the defendant, was injured at Bakersfield, California, suffering the loss of both legs. His complaint, filed on December 5, 1946, sought to recover the sum of $250,000. It contained two claims, one under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., which alleged negligence; the other,

under the Federal Boiler Inspection Act, 45 U.S.C.A. § 22 et seq., which alleged the same facts as a violation of that Act. After a trial lasting five days, a jury, on April 25, 1947, returned a verdict for the plaintiff, in the sum of $40,150. The plaintiff has moved for a new trial.

While the motion is based on all the usual grounds allowable under the law, actually the only point made turns upon the rejection of the testimony of an actuary as to the present value of a future sum, which, it is claimed, resulted in an inadequate award.

Because it is contended that this was an offer to prove this fact *according to standard annuity tables,* it is well to set forth a portion of the colloquy, during which the ruling was made:

"Mr. Myers: May I state my position, Your Honor, so you will understand what I have in mind?

"The Court: Yes.

"Mr. Myers: Following along the line suggested by Your Honor, I think counsel will agree at least that the evidence will show some loss of future earning capacity.

"The Court: That is right.

"Mr. Myers: Standing up in front of Your Honor and the Jury, saying this man, in all probability, has a life expectancy of so many years, that he is going to lose so much money a month for that period or that length of time, and to argue for that sum, *would be very unfair from the standpoint of the defendant.* You have got to allow for the earning power of money. That is why this man is on the stand, to tell you at one per cent, two per cent, three per cent, four per cent, or how much it would take to pay a dollar a month over a period of 36 years, until a sum which would pay a dollar a month over a period of 36 years, is deposited in a bank, would be exhausted. It is not a matter of saying how much his life is worth. It is a matter of saying what is the present value of a future sum. There are cases on it, Your Honor.

"The Court: Not that would be binding. It is a speculative method, not permissible under the state law or the federal law.

"Mr. Myers: May I ask Your Honor if that is any more speculative than to say a man will lose so much money a month over a period of years, and then take the whole 36 years life expectancy, in accordance with the American Experience Table, and multiply that and say he is going to lose that much money? *You are not allowing for the earning power of money. It isn't fair.*

"The Court: I don't think that is the kind of testimony that should be allowed. It has never been allowed in the federal courts. Under the total and permanent disability statutes—and I have tried nearly a hundred such cases—we have very liberal rules, and there we have allowed an expert to testify whether a man could work, or whether it would hurt him to work. Under the Stephens and Lumbra cases, even a doctor could not give an opinion as to whether a man is totally and permanently disabled. That is *for the Jury to decide. All you are allowed to put before a Jury are facts.*

"I give instructions to the effect that in determining general damages, the Jury has a right to take into consideration the nature and permanency of the injury, and I also instruct them that they have a right to consider possible losses arising therefrom. That is all the Jury should have. Not actuarial speculation. You might ask what my life is worth. Everybody knows what salary I get because it is fixed by the Congress. If something should happen to me —my age is 58—I am not ashamed of it—it would not be a question of determining what my life is worth. The question would be my earning power.

"Mr. Myers: I don't want to be arguing with Your Honor.

"The Court: Go right ahead.

"Mr. Myers: But it seems to me it is a *more scientific way* of figuring how much money it is going to take to pay an annuity over the period of a man's life expectancy to know what the actuarial figures are, if we don't know them than to argue *in our opinion this man is going to lose so much money every month for the next thirty-six years, and that amounts to so much money.*

"The Court: That is a question to argue to the Jury. I don't want an actuary to

give the Jury that information. These jurors are intelligent. You have business men, insurance men, and men with all sorts of experience. On the basis of the facts you have put in, they will listen to your arguments. *I am not going to stop your arguments. You don't have to have an actuary to reduce this to a mathematical formula, because the jurors are competent to do that themselves. I can point to one or two persons on the Jury who would be wizards in figuring out deductions from the facts.*

"Mr. Myers: In other words, *you prefer to have the Jury figure the present value of future sums?*

"The Court: *Yes. That is a matter of argument. You can present a legitimate argument, under the instructions I give, rather than having an actuary's testimony.*

"Mr. Myers: *That is agreeable."* (Emphasis added).

In his opening argument to the jury, counsel for the plaintiff gave his ideas on the measure of damages for lost wages on the basis of the actual earnings. An excerpt before me shows that, *on the loss of wages alone,* he argued to the jury for an award as high as $62,546. I quote from the record:

"So, then, if you would take $2200.00 a year for 36 years, and multiply it, you would find that would amount to so much money. Some of you, I think, have had experience in figuring annuities. And you would say what is the earning power of money now that you get on a savings account—is it one per cent? Is it two per cent? Maybe you can get two per cent. I don't know what it may be, but if he can get two per cent, you allow him two per cent on so much money that will pay Mr. Caldwell on this element of $200.00 per month for his life expectancy of 36 years.

"We would not take the full amount, *because it would not be fair,* but we will reduce it by allowing two per cent for the earning power of that money, and I think you will find on that basis—I am not taking the lowest amount. I am not taking the highest amount. I am trying to take a middle amount—and if we allow $200 per month at two per cent, we would have to figure that *we would have $62,546.00 in the bank to pay out on that element of damage.*

"So, roughly speaking, there is that element of loss of future earning capacity of 65—62—63—whatever you want to figure it—thousand dollars, substantially, in addition to his loss of wages up to the present time of $2250.00. Then, on top of that, you would want to assess him a substantial sum that would compensate him for the elements of damage in pain and suffering, suffered up to this present time, and also additional pain and suffering to be endured by him in the future. And an amount that will compensate him not only for that, but also an amount that will compensate him for wearing artificial limbs, not being able to engage in the activities of other normal people of his age, and in assessing that amount of damages, that, too, is left up to your discretion. I feel that a like amount would be fair for pain and suffering.

"I feel that this man should be compensated for having to go through life with the loss of his feet, because of what happened to him on September 6, 1946, and I am sure that when this case is submitted to you folks, on this Jury, and you go to your jury room, and figure out how much it is going to take to properly compensate Mr. Caldwell, you will find a verdict in his favor for an amount within the amount alleged in the complaint. It is alleged in the complaint he had suffered damages to the extent of $250,000." (Emphasis added)

It is, therefore, evident that in this, as in his closing argument, to the jury, *without objection or interruption,* counsel for the plaintiff indulged in speculation to his heart's content, and placed before the jury, by means of a blackboard, figures which would warrant a verdict of $250,000. And he must have had in mind the fact that he could so argue when he accepted my ruling and said that he was "satisfied."

The instructions were not objected to by either party. In addition to general instructions as to the province of the jury in assessing whatever amount they deemed reasonable as general damages suffered on account of the injury and its permanency, I gave the following instruction:

"According to the American Experience Table of Mortality, the expectancy of one

aged twenty eight years is 36.73 years. This fact, of which the Court take judicial notice, is now in evidence to be considered by you in arriving at the amount of damages, if you find that plaintiff is entitled to a verdict."

I advert to the fact that, contrary to the usual California practice, and the implication of Rule 9(g), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which requires that special and general damages be pleaded separately—the complaint grouped together special and general damages. This type of pleading, which seems to prevail among attorneys in the San Francisco Bay Area, prevents the Court from drawing the line between general and special damages—such as loss of wages, cost of hospitalization, and the like —which, as hornbrook law tells us, must be proved in dollars and cents. The result is that, instead of submitting a form of verdict to the jury calling for (1) an award of general damages to be determined by them on a reasonable basis from the showing as to the nature of the injury and its permanency, and of (2) special damages, to be determined on the basis of proof of actual loss incurred or to be incurred, estimated on a dollar and cents basis, the Court is compelled to instruct the jury to return a verdict for an amount covering both elements in one figure. This, alone, demonstrates the unfairness of any attempts to have an actuary speculate as to present value of future money, *as an opinion not grounded on standard annuity tables.*

And, where, as here, it is admitted that an injured person has future earning power, he cannot demand that, either on the subject of general or special damages, he be given *an endowment or trust fund, which, invested at the present time,* would bring him a certain amount. To do so would imply *total* incapacity to earn, which counsel for the plaintiff admit is not the case here. For they said in their opening argument:

"To what extent can this young man be rehabilitated, so as to pursue some useful calling in the future? He can be rehabilitated. There is no question about that. But that is going to entail money. When he rehabilitated, then the next question for you to concern yourselves with in that regard is, how much money is he going to be able to make because of the impaired marketability of his services, because of the fact that his extremities are amputated below the knees."

So, to allow an actuary to place before the jury an abstract figure of what it would cost to secure an annuity—*which is what was offered and refused*—is not, as counsel contended in the colloquy with the court, to be fair to the defendant, but to mislead the jury into accepting the hypothetical figure of another instead of an actual figure to be arrived at by them under the instructions, or a figure based on such use of *"annuity table as they might consider proper in connection with all the other evidence in the case relating to the impairment of earning capacity."* Coast S.S. Co. v. Brady, 5 Cir., 1925, 8 F.2d 16, 19. (Emphasis added)

■ In this case, the jury had before them testimony as to the plaintiff's earning power, and they were instructed fully, *without any objection,* on the elements of damages to be allowed both for loss of earning capacity and for mental and physical suffering. The *mortality tables were put in,* and the jury were instructed to consider them in arriving at the damages to be awarded. Annuity tables are admissible, *but they were not offered.* Despite this, counsel, unimpeded, were allowed to argue for a quarter of a million dollars verdict in the case of a twenty-eight year old switchman whose vocational limitations and future earning power were determined and circumscribed by his very occupation and his future progress in the same or kindred fields. As the matter related to evidence, the State rule governs. Rule 43, F.R.C.P. However, definite rulings of federal courts established the principle before the rules of civil procedure went into effect. Thus, in compliance with principles antedating them, the jury had before them all the elements, *except speculation,* which, under the binding decisions, are to be taken into consideration in determining matters of this character. See Vicksburg & Meridian R. Co. v. Putnam, 1886, 118 U.S. 545, 556, 7 S.Ct. 1, 30 L.Ed. 257;

Chesapeake & Ohio R. Co. v. Kelly, 1916, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117, L.R.A.1917F, 367; Gulf, Colorado & Santa Fe R. Co. v. Moser, 1927, 275 U.S. 133, 48 S.Ct. 49, 72 L.Ed. 200; Southern Pacific Co. v. Klinge, 10 Cir., 1933, 65 F.2d 85; Klinge v. Southern Pacific Co., 1936, 89 Utah 284, 57 P.2d 367, 105 A.L.R. 204; Emery v. Southern California Gas Co., 1946, 72 Cal.App.2d 281, 165 P.2d 695.

█ As said in Southern Pacific Co. v. Klinge, 10 Cir., 1933, 65 F.2d 85, 87:

"The trial court, concisely but clearly, told the jury to ascertain the impairment of plaintiff's earning power resulting from his injury; determine his expectancy; and arrive at a verdict which would reflect the present worth of that impairment. With annuity tables in evidence, the court's charge rendered the jury's task a comparatively simple one."

So, in this case, all the primary data, *except the Annuity Tables, which were never offered,* on which any argument as to present value of future money could be bottomed were before the jury. And no limits were placed upon the weight or consideration to be given them. More, counsel placed before the jury, *by way of argument,* not only these data, but the very computations he wished to elicit from the actuary. As arguments, these speculations were unobjectionable. What counsel seems to object to *now* is that they were deprived of the added weight as expert testimony. I do not think they were entitled to it as such in the form in which it was offered, even if I take the most favorable view of the cases cited by the plaintiff. In these cases, the Court either did not allow the primary facts or annuity and mortality tables to go before the jury, or its instructions so limited the inferences to be drawn by the jury from the facts as to either bind them to an absolute formula (Vicksburg & Meridian R. Co. v. Putnam, 1886, 118 U.S. 545, 7 S.Ct. 1, 30 L.Ed. 257; Southern Pacific Co. v. Klinge, 10 Cir., 1933, 65 F.2d 85; Klinge v. Southern Pacific Co., 1936, 89 Utah 284, 57 P.2d 367, 105 A.L.R. 204), or to forbid them to take into consideration, *in actions by survivors for death,* the value of future benefits of which the beneficiary was deprived. Chesapeake & Ohio

R. Co. v. Kelly, 1916, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117, L.R.A.1917F, 367; Gulf, Colorado & Santa Fe R. v. Moser, 1927, 275 U.S. 133, 48 S.Ct. 49, 72 L.Ed. 200.

The point now urged seems to reveal that the real intention of counsel for the plaintiff, in desiring to place these speculations in the form of expert testimony, was not to be fair to the defendant by enabling plaintiff's counsel to make a more scientific argument, *as claimed at the time,* but to place before the jury, not in the form of accepted annuity tables, but through the *opinion* of an expert, a *figure to be considered by them as a minimum upon which damages or part of the damages could be based.* This view is supported by the offer made and also by the summary or chart which they sought to elicit from the actuary, and which they attach to the motion, and which reads:

"Caldwell v. Southern Pacific

"Present Value of Monthly Payments for Expectancy

Age 28    Expectancy 36.7 years    American Experience Table Basic Value $1.00

| 1% | 2% | 3% | 4% |
|---|---|---|---|
| per month $368.78 | $312.73 | $268.42 | $233.03 |

"'Present Value' may be defined as the sum of money which, if deposited in a bank would be just sufficient to provide the monthly payments for the period stated, provided that interest on the balance in the account was credited each year at the rates shown. I certify that the above figures are the present values of the monthly amounts stated, using the indicated rates of interest, for a period of 36.7 years, which the life expectancy of a person 28 years old, based on the American Experience Table of Mortality.

"Angus L. Crawford

"Assistant Actuary

"San Francisco, California

"April 21, 1947."

This summary or chart demonstrates what the examination of the witness Crawford showed—that plaintiff sought to produce through this witness, *not standard annuity tables,* but the witness' own opinion as to the cost of an annuity based upon his experience in the field of insurance. Neither in this summary, nor in his examina-

tion, *is any reference made to annuity tables. There is reference to the mortality table.* As to it, in his testimony, Crawford sought to give his own opinion, which was rejected. Assuming that present value is an integral part of standard annuity tables, there is nothing in the statement or argument of counsel to the Court in favor of the admissibility of this testimony to indicate that the definition of the terms which it was sought to have him give *was to be based upon such tables.* On the contrary, the entire colloquy indicates that what was sought was to give the opinion of the witness as to the meaning of that term *unrelated to any standard or accepted procedure.* And the summary just quoted confirms this. By the same token, if, as counsel now claim, it was the intention to show the meaning of the term "present value," according to standard and accepted annuity practice, within the language of the court in Chesapeake & Ohio R. Co. v. Kelly, 1916, 241 U.S. 485, at page 491, 36 S.Ct. 630, 60 L.Ed. 1117, L.R.A.1917F, 367, the Court should not be charged with error for counsel's failure to indicate that fact clearly. While the discussion on the subject took place in the presence of the jury, there was no restraint imposed which prevented counsel from indicating fully his intention. Certainly it would not have harmed the plaintiff's cause, in the eyes of the jury, to have stated that they did not intend to offer *the personal opinion of the witness, but an opinion based on standard annuity tables of the type which the Courts have accepted.*

The position of the plaintiff is rather anomalous. It was claimed at the trial that the object of the offer was to minimize damages by putting their argument as to the amount on a more scientific basis, supported by expert testimony. If that be true, the plaintiff could not have been harmed by the refusal of the Court to receive the testimony. For his counsel was enabled thereby to claim larger amounts than actuarial analysis would show. If, on the other hand, *as is quite evident from the argument now made,* they sought to place before the jury, not as argument, but as a formula, based on the opinion of an expert, a minimum of recovery for loss of future earnings, ranging from $23,303 to $69,909, thus, in effect, telling the jury that it would take anywhere from $23,303 to $69,909 to secure an *annuity* which would return to the plaintiff the minimum loss he claimed, there is no decision warranting such testimony.

It is the very procedure condemned by the Supreme Court in Vicksburg, etc., R. v. Putnam, 1886, 118 U.S. 545, 556, 557, 7 S.Ct. 1, 30 L.Ed. 257. If it prevailed, we might as well allow witnesses to testify that, in their opinion, the plaintiff would lose a definite sum of money regardless of any future earnings. This is not countenanced by any of the cases called to my attention, and is condemned by some of the cases on which plaintiff now relies. See, Southern Pacific Co. v. Klinge, supra, and Klinge v. Southern Pacific, supra. And rightly. For the vice of testimony of this character in a case like the one before us, in which we are dealing with a person who is still alive, and has earning power, and in which the general and special damages have not been segregated, is that it overlooks the fact that the law, in allowing recovery of damages, either general or special, does not use as a criterion, the money which a person would have to pay in order to obtain insurance or an annuity yielding him a certain income for a period of years. Annuities are obtained on the basis of contributing a capital sum to obtain certain payments. The payments are presumed to cover and to exhaust the capital investment, except as to the interest, which the portion not withdrawn may earn. See, W. A. Paton, Accountant's Handbook, 1939, pp. 1652 et seq.

But when the law allows an award either for special or general damages, and especially the former, *it does not intend to award him a sum by way of a present endowment or trust fund.* In the case of a person who is not totally and permanently disabled, there is possibility of earning. The money he is awarded is for the loss he *might* suffer. See, Virginian Ry. Co. v. Armentrout, 4 Cir., 1946, 158 F.2d 358, 362, 363. The jury have a right to assume that the award they make could be invested in property or in a business which will earn a certain amount, the capital remaining in-

tact. So that, his life having run its course, the capital might still remain for his heirs, although he may have derived enough by way of usufruct to compensate him for the loss of actual income during the period. 3 Words and Phrases, Perm. Ed., 1940, pp. 487 et seq.; Bodine v. Commissioner, 3 Cir., 1939, 103 F.2d 982; Commissioner v. Meyer, 6 Cir., 1943, 139 F.2d 256; Manne v. Commissioner, 8 Cir., 1946, 155 F.2d 304.

As said by the Supreme Court in Chesapeake & Ohio R. Co. v. Kelly, 241 U.S. 485, 491, 36 S.Ct. 630, 631, 60 L.Ed. 1117, L.R. A.1917F, 367:

"So far as the verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self-evident that a given sum of money in hand is worth more than a like sum of money payable in the future. Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do *under the circumstances to limit the amount of damages.* Wicker v. Hoppock, 6 Wall. 94, 99, 18 L.Ed. 752, 753; The Baltimore, 8 Wall. 377, 387, 19 L.Ed. 463, 465; United States v. Smith, 94 U.S. 214, 218, 24 L.Ed. 115; Warren v. Stoddart, 105 U.S. 224, 229, 26 L.Ed. 1117, 1120; United States v. United States Fidelity & G. Co., 236 U.S. 512, 526, 35 S.Ct. 298, 59 L.Ed. 696, 703, and the putting out of money at interest is at this day so common a matter that ordinarily it cannot be excluded from consideration in determining the present equivalent of future payments, since a reasonable man, even from selfish motives, *would probably gain some money by way of interest upon the money recovered.* Savings banks and other established financial institutions are in many cases accessible for the deposit of moderate sums at interest, without substantial danger of loss; the sale of annuities is not unknown; and, for larger sums, state and municipal bonds and other securities of almost equal standing are commonly available.

"Local conditions are not to be disregarded, and, besides, there may be cases where the anticipated pecuniary advantage of which the beneficiary has been deprived covers an expectancy so short and is in the aggregate so small that a reasonable man could not be expected to make an investment or purchase an annuity with the proceeds of the judgment. But, *as a rule, and in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award."* (Emphasis added)

It follows that, in dealing with an award relating to both general and special damages, especially to the latter, you cannot capitalize the interest and determine the adequacy of the award or a portion of it on that basis.

The complaint that the award of damages is inadequate must go unheeded for another reason.

In his complaint, the plaintiff chose to group together general and special damages. While pleading separately loss of wages and earning power, he did not segregate the items from the general damages, either in the body of the complaint or in the prayer. On the contrary, he included them all in the aggregate demand for a quarter of a million dollars damages. So he cannot insist now that an unsegregated portion of the verdict be made to fit a particular theory of damages. And the plaintiff having set the pattern, how can I, as a judge, after a verdict, apply to the general verdict which he sought, a mathematical formula in order to sustain the contention now made that the damages are inadequate.

Jurors cannot impeach their own verdict. I cannot call them before me and ask them how they arrived at the particular amount. Nor can I determine what they allowed as general or as special damages, or what consideration they may have given to contributory negligence in reducing damages. And even if I determined that the loss of future earnings was assessed at a definite amount, how am I to segregate it from the verdict and determine that it is inadequate? When special damages are proved in a case, such as loss of wages,

cost of medical care incurred, and the like, it is conceivable that a court on finding that the actual award disregarded facts proved in the record, might set it aside. But here we are left in the dark as to the manner in which the award was apportioned between general and special damages, because the plaintiff chose to make a general demand covering both, and the Jury responded in the same manner.

■ Under the circumstances, even if I believed that, theoretically, in certain cases, a formula could be applied by which to gauge the adequacy of an award, this is not one of them. The award in a personal injury case must be considered in the light of experience in like cases in the particular community. I fear that counsel for the plaintiff, coming from the San Francisco Bay Area, are not familiar with the standards of living and values in areas like Bakersfield, where the plaintiff was injured, or Fresno, where the trial was had. These communities draw their chief income from agriculture. Money values are different from those in the metropolitan areas. To counsel for the plaintiff, a forty thousand verdict to a switchman twenty-eight years of age may seem small. But I doubt if one per cent of the population from which the jury was drawn, would be able to buy a $40,000 annuity. And, as the jurors were instructed that, in awarding damages, they were to consider their own experience—an instruction given by the Court without objection and patterned on an instruction submitted by counsel for the plaintiff, not only here, but in several other Railroad Employers' Liability cases in which they appeared, and which I tried in the San Francisco Bay Area, a little over a month before this one—the plaintiff cannot complain that juries in Fresno are less generous than those in the cities of San Francisco and Oakland. More, as I call to my aid my own experience of nearly twenty years as a judge of the Superior Court of the State of California for the metropolitan area of Los Angeles County, and as a judge of the United States District Court for the Southern District of California, holding court at Fresno, Los Angeles and San Diego, I recall only one verdict in a personal injury case in which the amount awarded was larger. That was in a case against an interstate railroad arising from a collision in which the injured person, a clergyman, a person of higher earning capacity than the plaintiff, suffered a much greater injury, a mental injury, and was rendered a psychopath, which made his very appearance in court tragic. A man of broad education with great possibilities was turned from an intellectual occupation into a physical and mental wreck. And the verdict, rendered about three years ago, was $50,000. At that, the railroad company, although the case was one of admitted liability, contended, on a motion for a new trial, that it was excessive. But I declined to set it aside.

This brings up another matter.

■■ I concede that, under Rule 59 of the Federal Rules of Civil Procedure, providing that new trials may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States," the Court has the power to grant a motion for a new trial for inadequacy of the damages awarded. See, Stetson v. Sindt, 3 Cir., 1922, 279 F. 209, 23 A.L.R. 302; Dimick v. Schiedt, 1935, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, 95 A.L.R. 1150. But this rule does not mean that I am to substitute my judgment for that of the jury. See, Aetna Casualty, etc., Co. v. Yeats, 4 Cir., 1941, 122 F.2d 350, 357. It merely means that when, *under the law,* the plaintiff is entitled, *as of right* or according to an established formula, to a minimum of special damages, or the verdict of the jury as to general damages, considering the elements involved, is so inadequate as *to shock the conscience of the court,* the court should intervene. Were it otherwise, it would mean that in any case in which my own opinion as to the damages awarded does not coincide with that of the jury, I would set it aside. This would subvert the function of the jury. For, of course, it would work the other way also, as the same rule and principle which allow us to set aside verdicts for insufficiency of the evidence, also obtain in case of excessiveness of damages. As said by Mr. Justice Harlan in an old case:

"It cannot be disputed that the court is within the limits of its authority when it sets aside the verdict of the jury, and grants a new trial, where the damages are palpably or *outrageously* excessive. Ducker v. Wood, 1 T.R. 277; Hewlett v. Crutchley, 5 Taunt. 277, 281; authorities cited in Sedgwick on Damages, 6th Ed. 762, Note 2. But, in considering whether a new trial should be granted upon that ground, the court necessarily determines, in its own mind, whether a verdict for a given amount would be liable to the objection that it was excessive. The authority of the court to determine whether the damages are excessive implies authority to determine when they are not of that character." Arkansas Cattle Co. v. Mann, 1889, 130 U.S. 69, 74, 9 S.Ct. 458, 459, 32 L. Ed. 854. (Emphasis added)

And see, McCoy v. Cate, 1 Cir., 1941, 117 F.2d 194; Murphy v. United States, 9 Cir., 1944, 145 F.2d 1018, 1040; Jones v. Atlantic Refining Co., D.C.E.D.Pa., 1944, 55 F.Supp. 17.

If counsel desire to have the judgment of the court upon these matters, they can secure it easily by not demanding a jury trial. Rule 38(d), F.R.C.P. Then they receive the judgment of the court, not only on the question of liability, but also on the question of damages, *unaided by the jury*. But when they demand a jury, *they must take the chance of accepting the jury's judgment as to both questions,* unless, of course, the verdict is so vulnerable legally that the Court is compelled to set it aside. And this is especially true when the verdict is arrived at on instructions as to both liability and damages *not objected to by either party*.

What I have just said should not be taken as an indication that had I tried this case and found liability, my verdict would have been for a greater or less amount. I merely state why, in the light of the facts, I do not consider that the verdict is inadequate or concede that it might have been larger, if the actuarial testimony had been given. As already appears, the testimony was not offered for the purpose of enhancing damages, but, as counsel for plaintiff *then* claimed, as a gesture of *fairness,* to the defendant, which might result in mini-mizing damages—a contention they *now* reject by claiming that, had the actuarial testimony been given, the verdict might have been larger. Consistency is not a virtue. But in litigation of this kind, when counsel offer testimony *upon one ground,* and then, when it is rejected, accept the ruling, and, after the verdict, object to the rejection *upon a different ground,* the court, while not denying his right to do so, is simply not impressed.

I conclude that the offered testimony was properly rejected, that no prejudice resulted from its rejection, and that the damages are not inadequate. The case was tried fairly, fully, and leisurely. The fact that no questions are raised as to the evidence offered and received—except in the one respect discussed—that no objections were made to the instructions, and that the court gave to the plaintiff the benefit of two theories of liability—negligence under the Federal Employers' Liability Act and violation of the Federal Boiler Inspection Act—are proof of this. Nor, for the reasons indicated, does the verdict of the jury as to damages prove the contrary. See, 28 U.S. C.A. § 391, Rule 61, F.R.C.P.

The motion for a new trial is, therefore, denied.